IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:15-cv-00020-FL

| | |
|---|---|
| **Jacqueline Maria Harrington,**<br><br>    Plaintiff,<br><br>v.<br><br>**Carolyn Colvin**, Acting Commissioner of Social Security,<br><br>    Defendant. | **Memorandum &Recommendation** |

  Plaintiff Jacqueline Maria Harrington instituted this action on February 10, 2015 to challenge the denial of her applications for disability benefits and supplemental security income. Harrington claims that Administrative Law Judge ("ALJ") Odell Grooms erred in accounting for the limiting effects of her post-traumatic headaches in the residual functional capacity ("RFC") determination, erred in weighing the medical opinions, and erred in assessing her mental impairments. Both Harrington and Defendant Carolyn Colvin, the Acting Commissioner of Social Security, have filed motions seeking a judgment on the pleadings in their favor. D.E. 19, 21

  After reviewing the parties' arguments, the court finds that ALJ Grooms erred in his determination. Substantial evidence does not support ALJ Grooms's consideration of Harrington's headaches and their limiting effects. Additionally, what effect Harrington's reduced intellectual functioning has on her residual functional capacity ("RFC") is unclear. Therefore, the

undersigned magistrate judge recommends[1] that Harrington's Motion for Judgment on the Pleadings be granted, that Colvin's Motion for Judgment on the Pleadings be denied, and that the Commissioner's final decision be reversed and remanded for further consideration.

## I.     Background

On February 24, 2011, Harrington filed an application for disability benefits on the basis of a disability that allegedly began on December 23, 2008. She also protectively filed an application for supplemental security income on June 20, 2011 on the basis on a disability that allegedly began on December 23, 2008. After her claims were denied at both the initial stage and upon reconsideration, Harrington appeared before ALJ Grooms for a hearing to determine whether she was entitled to benefits. After the hearing, ALJ Grooms determined that Harrington was not entitled to benefits because she was not disabled. Tr. at 10–22.

ALJ Grooms found that Harrington had the following severe impairments: left knee osteoarthritis; chronic post-traumatic headaches; depressive disorder (NOS); and cognitive disorder (NOS). *Id.* at 12. ALJ Grooms also found that her impairments, alone or in combination, did not meet or equal a Listing impairment. *Id.* at 13. ALJ Grooms determined that Harrington had the RFC to perform light work with the following exceptions: she can frequently climb ramps, stairs, ladders, ropes, and scaffolds; she can frequently balance and kneel; she can frequently, but not constantly, use the lower left extremity to push and pull; she should avoid concentrated exposure to hazards such as dangerous machinery, unprotected heights, and uneven surfaces; she is limited to simple, routine, repetitive tasks with few workplace changes; she can occasionally interact with the general public, co-workers, and supervisors; she cannot perform any work at a production-paced rate; and she should avoid exposure to loud noises. *Id.* at 14.

---

[1] The court has referred this matter to the undersigned for entry of a Memorandum and Recommendation. 28 U.S.C. § 636(b).

ALJ Grooms also concluded that Harrington was unable to perform any past relevant work but that, considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she was capable of performing. *Id.* at 20–21. These jobs included: office cleaner and cafeteria attendant. *Id.* at 21–22. Thus, ALJ Grooms found that Harrington was not disabled. *Id*.

After unsuccessfully seeking review by the Appeals Council, Harrington commenced this action and filed a complaint pursuant to 42 U.S.C. § 405(g) on February 10, 2015. D.E. 6.

**II.     Analysis**

   **A.     Standard for Review of the Acting Commissioner's Final Decision**

When a social security claimant appeals a final decision of the Commissioner, the district court's review is limited to the determination of whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Harrington v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). If the Commissioner's decision is supported by such evidence, it must be affirmed. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

   **B.     Standard for Evaluating Disability**

In making a disability determination, the ALJ engages in a five-step evaluation process. 20 C.F.R. § 404.1520; *see Johnson v. Barnhart*, 434 F.3d 650 (4th Cir. 2005). The analysis requires the ALJ to consider the following enumerated factors sequentially. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. At step two, the claim is denied if the claimant does not have a severe impairment or combination of impairments

significantly limiting him or her from performing basic work activities. At step three, the claimant's impairment is compared to those in the Listing of Impairments. *See* 20 C.F.R. Part 404, Subpart P, App. 1. If the impairment is listed in the Listing of Impairments or if it is equivalent to a listed impairment, disability is conclusively presumed. However, if the claimant's impairment does not meet or equal a listed impairment then, at step four, the claimant's RFC is assessed to determine whether plaintiff can perform his past work despite his impairments. If the claimant cannot perform past relevant work, the analysis moves on to step five: establishing whether the claimant, based on his age, work experience, and RFC can perform other substantial gainful work. The burden of proof is on the claimant for the first four steps of this inquiry, but shifts to the Commissioner at the fifth step. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

### C. Medical Evidence

In December 2008, Harrington suffered a severe, work-related injury when a metal door closed on her face. Tr. at 48. Following the incident, she began experiencing headaches with increased frequency. *Id.* In April 2009, Harrington went to the ER complaining of headaches, dizziness and imbalance for three months. *Id.* at 354. A CT scan was negative but the attending physician, Dr. Matthew Harmody, opined that her symptoms were likely post-concussive. *Id.* at 355.

Harrington received follow-up care from her primary physician, Dr. Fred McQueen, for headaches that continued despite medication. *Id.* at 363, 418. She returned to the ER in November 2009 complaining of a severe headache that lasted three to four days. *Id.* at 368. Dr. Steven Strobel noted Harrington headaches were most likely post-traumatic symptoms. *Id.* at 369. In December 2009, Harrington was seen by neurologist Dr. Venugopal Gadipudi who noted

4

her headaches, lightheadedness and impaired memory. *Id.* at 376. Dr. Gadipudi's diagnosis was concussive syndrome with post-traumatic headaches. *Id.* Medical records indicate that Harrington's headaches continued, and that medication provided only some relief. *Id.* at 377–79.

In June 2010, Harrington sought an evaluation at the Carolina Headache Institute. She described suffering severe headaches one to two days per week that were relieved only with rest and hydrocodone. *Id.* at 429. In August 2010, Harrington reported that the increased frequency of her headaches caused her to miss work two to three days per week. *Id.* at 436. She also complained of poor memory and concentration. *Id.* Dr. Alan Finkel recommended neuropsychological testing. *Id.* at 444. Dr. Finkel determined that Harrington's cognitive function was normal and that she had an appropriate fund of knowledge. *Id.* at 429–53.

On August 25, 2010, Harrington went to the ER after passing out at work while suffering a headache. *Id.* at 382. Following her discharge, Dr. McQueen placed her on a 60 day leave of absence because of the headaches and syncopal episodes. *Id.* at 409. However, despite resting at home over those months, Harrington's headaches increased in frequency to three to four times per week. *Id.* at 441. Harrington reported that the headaches were aggravated by noise and light and improved with rest. *Id.*

Harrington underwent a psychological evaluation and neuropsychological testing with Dr. Sutapa Ford in November 2010. *Id.* at 421–25. She reported worsening of her depression since her injury and increased headaches. *Id.* at 421. Harrington's full scale IQ score was measured at 67, and Dr. Ford opined that her premorbid intelligence was in the borderline range. *Id.* at 424. Dr. Ford opined that her severe depression was a significant contributing factor and recommended treatment. *Id.* at 425.

5

In February 2011, Dr. Finkel noted that Harrington was suffering from bad headaches two to three times per month, each lasting one to two days. *Id.* at 450. He also noted that the headaches were attended by nausea and both photophobia and phonophobia. *Id.* He concluded that Harrington had reached maximum medical improvement. *Id.* at 453. In March and June, Dr. McQueen noted that Harrington continued to suffer from headaches, which were her main medical problem. *Id.* at 407, 457.

Harrington underwent a psychological consultative examination in August 2011 with state agency physician Dr. Joseph Appollo. Records noted that Harrington had difficulties with headaches, concentration, and depression. *Id.* at 480. He estimated that her intelligence was in the borderline range, that her memory index was impaired, and her visual memory was impaired. *Id.* at 484. Following testing, Dr. Appollo opined that Harrington had marked limitations in the ability to sustain memory to perform simple, repetitive tasks and marked problems in tolerating the stress and pressure associated with day-to-day work activity. *Id.* at 490. Dr. Appollo diagnosed depressive disorder and cognitive disorder. *Id.*

A November 2011 consultative examination with Dr. Ferriss Locklear noted that Harrington had normal CT scans on several occasions. *Id.* at 493–98. Dr. Locklear diagnosed chronic headaches, history of head trauma, and chronic left knee pain. *Id.*

Dr. McQueen noted Harrington's continuing headaches in December 2011 and March 2012, when Dr. McQueen remarked that Harrington had again sought ER treatment for lightheadedness and headaches. *Id.* at 503, 505. Dr. McQueen records reflect that her headaches continued throughout 2012. *Id.* at 505, 506, 511, 515, 518, 524, 528, 540, 545.

### D. Chronic post-traumatic headaches

Harrington contends that ALJ Grooms failed to sufficiently account for her post-traumatic headaches and their limiting effects. While the RFC contained a limitation to avoid loud noise, Harrington asserts that her headaches were also aggravated by light and, further, that her headaches persisted even after she stopped working. The Commissioner argues that ALJ Grooms properly considered her headaches and their effects on her RFC. The undersigned concludes that ALJ Grooms failed to properly evaluate this condition by requiring Harrington to substantiate this condition with objective evidence.

An ALJ employs a two-step process in evaluating the intensity, persistence, and limiting effects of symptoms on a claimant's ability to perform basic work. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996); S.S.R. 96–7p. 1996 WL 374186 at *2 (July 2, 1996). "First, the ALJ must determine whether medically determinable mental or physical impairments can produce the symptoms alleged. Second, the ALJ must evaluate the claimant's testimony about his subjective experiences." *Fisher v. Barnhart*, 181 F. App'x 359, 363 (4th Cir. 2006) (per curiam) (citing *Craig*, 76 F.3d at 591–96). The ALJ must consider the entire record in making this determination. 20 C.F.R. § 404.1529(c); S.S.R. 96–7p, 1996 WL 374186 at *4. The ALJ may not discredit a claimant's testimony regarding the intensity and persistence of her symptoms merely because the objective medical evidence, meaning that based upon clinical and laboratory diagnostic techniques, does not substantiate that testimony. 20 C.F.R. § 404.1529(c)(2). In addition to the objective medical evidence, the ALJ must consider a number of enumerated factors, such as the effect of symptoms on the claimant's daily life activities and the location, duration, frequency, and intensity of plaintiff's pain or other symptoms. 20 C.F.R. §

7

404.1529(c)(3). "The reasons for the [ALJ's] credibility finding must be grounded in the evidence and articulated in the determination or decision." S.S.R. 96–7p, 1996 WL 374186 at *4.

In his decision, ALJ Grooms noted that Harrington's headaches were a severe impairment. Tr. at 12. The RFC determination contained limitations to simple, routine, repetitive tasks with few workplace changes, occasional interactions with others, no production-paced work, and avoidance of exposure to loud noises. *Id.* at 14. However, ALJ Grooms found Harrington's allegations only partially credible, noting that the objective medical evidence showed that she was not as limited as she alleged. *Id.* at 18. While she had moderate limitations in activities of daily living, social functioning, and maintaining concentration, persistence and pace, ALJ Grooms also noted that her examinations and CT scans were normal and her treatment was conservative. *Id.* at 19.

Harrington maintains that these limitations fail to fully accommodate her headaches and their limiting effects. While ALJ Grooms noted that CT scans showed no acute processes, *id.* at 15, 18, Harrington argues that headaches would not show up on such testing, which is used to rule out other causes that are detectable, such as a stroke. Even if the scan is performed during a headache, Harrington submits the scan will not indicate anything confirming the presence of a headache. The Seventh Circuit has noted:

> The ALJ ... appears to have thought, incorrectly, that the [normal] neurological test results somehow undercut [plaintiff's] claims that her migraines are severely painful. In fact, nothing in the record suggests that these tests can confirm either the existence of migraines or their likely severity. If anything, [plaintiff's treating physician's] conclusion that [plaintiff] suffered from severe migraines even in the face of the normal test results show that there are no diagnostic tests that work particularly well for migraines.

*Strickland v. Barnhart*, 107 F. App'x 685, 689 (7th Cir. 2004) (unpublished). Accordingly, ALJ Grooms's reliance on the unremarkable result of her CT scan merely suggests that the cause of

8

her headaches cannot be identified through such testing, not that she does not suffer from headaches. *See Taylor v. Astrue*, No. 7:10-cv-149-FL, 2011 WL 2669295, at *4 (E.D.N.C. May 23, 2011) ("In discounting Claimant's complaints of pain associated with her headaches, it appears that the ALJ relied, at least in part, on a lack of objective evidence. However, any such reliance by the ALJ was error as migraines cannot be diagnosed or confirmed through laboratory or diagnostic testing) (citations omitted), *Mem. & Rec. adopted*, 2011 WL 2669290 (Jul. 7, 2011); *Sidbury v. Astrue*, No. 7:08-CV-168-FL, 2009 WL 3029741, at *6 (E.D.N.C. Sept. 22, 2009) (same). The undersigned concludes that similar findings made with respect to migraine headaches can be extended to post-traumatic headaches.

Harrington points to the medical record supporting this condition. While her headaches were intermittent shortly after her head injury, by October 2010 she was experiencing headaches three to four times per week. Tr. at 441. In February 2011, Harrington reported having headaches two to three times per month, each lasting one to two days. *Id.* at 450. She had to lie down and rest until they subsided, and she reported sensitivity to both light and sound. *Id.* At the hearing, Harrington testified that she had to lie down four to five times per month due to her severe headaches. *Id.* at 58–59.

The medical record also shows that Dr. Harmody noted that her CT scan was negative but opined that her symptoms were likely related to post-concussive syndrome. *Id.* at 355. Dr. Strobel noted in November 2009 that Harrington's headache was identical to those she had been experiencing for several months since her head trauma incident. *Id.* at 368. Drs. Gadipudi, Finkel and McQueen noted that she was suffering from severe post-traumatic headaches and that medication provided only mild relief. *Id.* at 363, 377, 409, 418, 431, 453. Additionally, her activities of daily living were compromised, as her husband's third-party statement reflected that

Harrington was forgetful, she had to be reminded to perform household chores, she could not go out alone, and she relied on family members to pay bills. *Id.* at 13. Moreover, ALJ Grooms's finding that her treatment was conservative and required no emergency care fails to account for her November 2009 and August 2010 ER visits. *Id.* at 383. The latter was prompted by her passing out due to a headache while at work. *Id.* at 368, 383. This was followed by a sixty day medical leave of absence directed by her primary physician. *Id.* at 409.

The medical evidence of record establishes that Harrington suffered from conditions reasonably likely to cause the alleged symptoms based on her diagnoses of post-traumatic headaches, depressive disorder (NOS) and cognitive disorder (NOS). Accordingly, Harrington could "rely exclusively on subjective evidence" to prove her symptoms resulting from these conditions were disabling. *See Brownlee-Nobs v. Colvin*, No. 1:14-cv-03988-JMC, 2015 WL 5908524, at *15 (D.S.C. Oct. 7, 2015) (citing *Hines v. Branhardt*, 453 F.3d 559, 565 (4th Cir. 2006)). The ALJ erred to the extent that he relied upon a lack of objective findings to undermine Harrington's subjective complaints. For this reason, remand is warranted.

### E. Evaluation of psychological opinions and mental limitations

Harrington also asserts that ALJ Grooms erred in weighing the psychological opinion evidence and his subsequent assessment of her mental limitations. The Commissioner maintains that ALJ Grooms properly considered the opinion evidence and Harrington's mental limitations. The undersigned finds that Harrington's mental limitations require further analysis.

#### 1. Dr. Appollo's opinion

At the hearing, Harrington testified that she had difficulty concentrating and remembering, and she stated that she had a hard time understanding when reading. Tr. at 55, 58. Consultative examiner Dr. Appollo determined that Harrington suffered from marked limitations

10

in her ability to sustain attention and to perform simple, repetitive tasks. *Id.* at 490. Dr. Appollo also administered the Wide Range Assessment of Memory and Learning to Harrington, who scored in the deficient to borderline range. *Id.* at 484–90. Given these results, Dr. Appollo opined that Harrington would have marked impairment in her ability to sustain attention to perform simple tasks. *Id.*

According to the regulations promulgated by the Commissioner, a treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R § 416.927. Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. Under such circumstances, the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence. *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992).

Here, ALJ Grooms gave Dr. Appollo's opinion only partial weight. Tr. at 18. He concluded that Harrington's diagnoses of depressive disorder and cognitive disorder are consistent with the evidence of record showing she was depressed. *Id.* But whereas Dr. Appollo opined that Harrington had marked limitations in her ability to understand, retain, and follow instructions; marked limitations in her ability to sustain attention to perform simple, repetitive tasks; and marked limitations in her ability to tolerate the stress and pressure associated with day-to-day work activity, ALJ Grooms found that she had only moderate limitations in her activities of daily living, social functioning, and maintaining concentration, persistence, and pace. *Id.* at 13, 17.

ALJ Grooms's conclusion is supported by state agency consultants Drs. Linda O'Neil and Nancy Herrera, both of whom opined that Harrington had moderate limitations in the areas of activities of daily living, social functioning, and maintaining concentration, persistence, and pace. *Id.* at 108, 138. These assessments constitute substantial evidence upon which ALJ Grooms was entitled to rely. *See* S.S.R. 96-6p. Additionally, Dr. Finkel concluded that Harrington's cognitive function was normal and she had an appropriate fund of knowledge. Tr. at 429–53. ALJ Grooms also noted that her primary physician, Dr. McQueen, found that she had normal insight, judgment, and recent and remote memory. *Id.* at 16. Similarly, consultative examiner Dr. Ford found that Harrington's thought processes were normal, her thought content was appropriate, and her judgment and insight were grossly intact. *Id.* at 421. Dr. Ford also noted that testing did not reveal a clear pattern of deficits consistent with a traumatic brain. *Id.* at 425. He opined that Harrington's depression was a significant contributing factor to her psychological symptoms, which would likely improve as her depression improved with treatment. *Id.* at 425–26.

In sum, the limitations related by Harrington or assessed by Dr. Appollo in the four broad functional categories of paragraph B are not fully consistent with other substantial evidence in the record from Drs. Finkel, McQueen, Ford, O'Neil, and Herrera. Because Dr. Appollo's assessed limitations were inconsistent with the other evidence, it was within the discretion of ALJ Grooms to afford his opinion less weight. In light of contrary evidence in the record, ALJ Groom's did not err in giving Dr. Appollo's opinion only partial weight. Accordingly, Harrington's motion should be denied with respect to this issue.

12

### 2. Mental limitations

Harrington also asserts that ALJ Grooms improperly assessed her mental limitations. She argues that ALJ Groom's relied on Dr. Finkel's findings which, she submits, are belied by her low IQ scores, suggestive of mild mental retardation. She points out that Dr. Ford's concluded that the IQ scores obtained were valid. *Id.* at 423–24. Harrington contends that the IQ scores undermine Dr. Finkel's assessment of her cognition. She also maintains that ALJ Grooms's failure to evaluate her IQ scores or the WRAML results warrants remand.

ALJ Grooms appropriately considered Harrington's mental impairments under Listings 12.02 (Organic mental disorders) and 12.04 (Affective disorders). The Commissioner further maintains that consideration under Listing 12.05 (Mental retardation) was not warranted. Listing 12.05 requires sub-average general intellectual functioning manifested in deficits in adaptive functioning with an onset date before age 22. The Commissioner submits that the evidence shows Harrington went to the 11th grade in high school, was assigned to regular classes, not special education, and obtained her driver's license. This evidence, she contends, suggests that Harrington has not demonstrated evidence that she had sub-average intellectual functioning before age 22.

However, at the hearing before the undersigned, counsel for Harrington stated that Harrington does not contend that she meets or equals Listing 12.05. Nonetheless, she argues that, combined with her other impairments, her intellectual functioning must be considered when determining her RFC.

As noted above, Harrington suffered a head injury in 2009. Although a person's IQ scores is generally considered stable over time, *see Luckey v. U.S. Dep't. of Health & Human Srvs.*, 890 F.2d 666, 669 (4th Cir. 1989) (stating that a person's IQ is presumed to remain stable

13

over time "in the absence of any evidence of a change in a claimant's intellectual functioning"), this presumption may be rebutted by evidence that an injury during adulthood caused the intellectual impairment. *See Hodges v. Barnhart*, 276 F.3d 1265, 1268–1269 (11th Cir. 2001) (finding that, in the absence of evidence of a sudden trauma that can cause mental retardation, IQ's remain fairly constant throughout life); *Taylor v. Astrue*, No., 2011 WL 4055243, at *13 (E.D. Cal. Sept. 12, 2011) (presumption of constant IQ throughout life may be rebutted by evidence of an injury during adulthood caused intellectual impairment) (citing *Maresh v. Barnhart*, 438 F.3d 897, 900 (8th Cir. 2006) ("a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning")). The presumed stableness of one's IQ scores are rebutted in this instance by Harrington's traumatic head injury.

The evidence in the record suggests that Harrington's intellectual functioning has been reduced following her work accident. Dr. Ford, who administered the intellectual testing, noted that "her premorbid functions prior to the work injury were in the borderline range." Tr. at 425. A fair reading of this notation suggest Harrington's traumatic brain injury decreased the range of her intellectual functioning. Additionally, Dr. Appollo found that Harrington's intelligence was in the borderline range and that her memory was impaired. *Id.* at 484.

While there is no evidence in the record that any doctor ever diagnosed mental retardation, aside from Dr. Ford's assessment, there is no notation that her intellectual functioning was ever examined in any diagnostic manner. What effect, if any, Harrington's intellectual functioning has on her RFC cannot be ascertained upon review of ALJ Grooms's determination. Given the findings of Drs. Ford and Appollo regarding Harrington's impaired intellect, ALJ Grooms erred by failing to address this impairment.

14

Accordingly, the undersigned recommends judgment in favor of Harrington on this issue. On remand, the Commissioner shall more fully evaluate Harrington's intellectual functioning and fully discuss its impact on her RFC.

## III. Conclusion

For the forgoing reasons, the court recommends that Harrington's Motion for Judgment on the Pleadings (D.E. 19) be granted, that Colvin's Motion for Judgment on the Pleadings (D.E. 21) be denied, and that the Commissioner's final decision be remanded for further consideration.

Furthermore, the court directs that the Clerk of Court serve a copy of this Memorandum and Recommendation on each of the parties or, if represented, their counsel. Each party shall have until 14 days after service of the Memorandum and Recommendation on the party to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a *de novo* determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the**

15

Case 7:15-cv-00020-FL   Document 26   Filed 01/04/16   Page 15 of 16

**Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Owen v. Collins*, 766 F.2d 841, 846–47 (4th Cir. 1985).

Dated: January 4, 2016.

_____
ROBERT T. NUMBERS, II
UNITED STATES MAGISTRATE JUDGE